UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KELVIN WAYNE DIXON,

    Plaintiff,

    v.                                   CAUSE NO. 3:25-CV-817 DRL-SJF

DANIELLE HAMLIN, KRISTIN
PARTAIN, and WARDEN OF MIAMI
CORRECTIONAL FACILITY,

    Defendants.

OPINION AND ORDER

Kelvin Wayne Dixon, a prisoner without a lawyer, filed a complaint and a motion for a preliminary injunction regarding his post-cancer and other medical care at Miami Correctional Facility. ECF 9. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotations and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

Mr. Dixon alleges in May 2023 he was diagnosed with a cancerous tumor in his abdomen. The cancer was a stage 3 gastrointestinal stromal tumor (GIST)—spindle cell type. He was put on the cancer drug Imatinib, which he says caused two side effects: his muscles would suddenly spasm and cramp, causing extreme pain and uncontrolled

movement, and the medication was damaging his kidneys. His oncologist addressed these side effects with a prescription for the muscle relaxant Flexeril and Bengay cream as needed to relieve pain and cramping. Mr. Dixon was also prescribed a pre-renal diet for the kidney damage.

Mr. Dixon had surgery just over a year later on July 31, 2024, to remove the tumor. After the surgery, he was transferred to Miami Correctional Facility, where he is currently located. Mr. Dixon alleges his medical care at Miami is handled primarily by Nurse Hamlin, with additional care from other providers when she is not available. He sues thirteen defendants for various issues with his medical care at Miami.

To state an Eighth Amendment claim for the denial of the right to adequate medical care, a prisoner must allege (1) he had an objectively serious medical need and (2) the defendant acted with deliberate indifference to that medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

On the second prong, deliberate indifference represents a high standard. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to state an Eighth Amendment claim. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Instead, the inmate must allege "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being

2

harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (cleaned up). "Deliberate indifference occupies a space slightly below intent and poses a high hurdle and an exacting standard requiring something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quotations and citation omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004). But at a certain point, persisting with a course of treatment known to be ineffective becomes deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

First, Mr. Dixon complains the prison is not following his oncologist's instructions about follow-up visits. He says his oncologist instructed that for the next three years he receive a CT scan every 90 days with a follow-up visit to monitor for recurrence of the cancer. He explains that GIST has a high rate of return, so it is important that he be seen every 90 days to catch promptly any sign of the cancer's return. However, he says, the visits have been late, anywhere from a week to a month after the 90-day mark.[1] This does not state an Eighth Amendment claim because follow-up visits being moderately delayed, even by a month, does not demonstrate a total unconcern for his well-being. Even in the unincarcerated world, follow-up visits for cancer treatment can be delayed without anyone attributing ill motives to physicians or other caregivers.

Next, Mr. Dixon complains that he has had difficulties in consistently receiving his various medications, and he names as defendants several nurses and other medical staff, who presumably were responsible for administering his medication. He takes several different medications. One group of medication is designated as "may carry," and these include meclizine (for dizzy spells), Lopressor (for a heart arrythmia), ezetimibe (for cholesterol), fenofibrate (for cholesterol), fiber pills, lisinopril (for blood pressure), finasteride (for his prostrate), and omeprazole (for nausea and vomiting). He is given a 30-day supply and is responsible for taking them on his own. Seven days before he runs

---

[1] Mr. Dixon also reported that in June 2025 Nurse Hamlin said she was changing the oncology follow-up to every 180 days instead of 90 days. He says she told him that his medical care had already cost more than $500,000, and his offsite visits were taking up too many of the limited slots available for outside medical trips. However, Mr. Dixon reports that he had another cancer follow up in September 2025, so it appears the 90-day follow-ups are still being done.

4

out of these medications, he is required to submit a healthcare request form requesting renewal.

The other group of medications consists of the cancer drug Imatinib and the muscle relaxant Flexeril. These medications are distributed by medical staff each day. Mr. Dixon is supposed to receive Imatinib once a day in the morning and Flexeril twice a day, in the morning and evening. He alleges that medical staff are responsible for reordering this medication when it is time.

Mr. Dixon's medication problems began a couple weeks after his arrival at Miami when he was released from the infirmary into the general population. After the move, he says he received neither Imatinib nor Flexeril the first three days. Then, he identifies three occasions he did not receive Imatinib at all—January 30, January 31, and March 14, 2025.

Mr. Dixon identifies more instances in which he went without Flexeril. In addition to the three days right after he was placed in general population, he went without any Flexeril on four days—July 17-19, 2025, and July 25, 2025—and on several other days he went without one of the two daily doses:

- January 13, 2025;
- January 27, 2025;
- January 28, 2025;
- March 10, 2025;
- July 26, 2025;
- August 1, 2025; and
- September 6, 2025.

Mr. Dixon says that when he misses a dose of Flexeril, he is in extreme pain because his whole body cramps up. It often prevents him from sleeping.

Mr. Dixon also alleges problems with timely refilling his "may carry" medications. Although he says he was diligent in requesting renewals, there were several occasions where his "may carry" medications were late. Overall, he identifies five occasions some or all of his "may carry" medications were late, sometimes lasting just a day and the longest being eight days. In addition, he says that he went without his hemorrhoid medication for a month, leaving him unable to sit down because of the pain.

Mr. Dixon does not identify an individual defendant whose actions resulted in him not getting his medications over all this time or who could be said to be deliberately indifferent. Deliberate indifference requires more than negligence—that is, merely forgetting to do something. He does not allege facts that allow a reasonable inference that any defendant's actions were done intentionally or recklessly. Often, the amended complaint simply says he did not get his medications and claims that this alone constitutes an Eighth Amendment violation. In looking at the grievance responses he attached to the complaint, some of the delays were attributed to the medications not arriving at the prison on time (ECF 9-1 at 13), in one instance it was reported he slept through the evening med pass (ECF 9-1 at 22), another time the nurse made a mistake (ECF 9-1 at 26), other times the medication was not restocked or the medical assistant couldn't find it (ECF 9-1 at 40, 45). These reasons aren't necessarily true, but they demonstrate that the various problems Mr. Dixon had with his medications are not easily ascribed to one reason, much less deliberate indifference, or to one person. Based on the allegations here, no one individual can plausibly be said to have acted with deliberate indifference regarding any particular instance of medication being missing.

The collective allegations raise concerns nonetheless. In looking at his medication delivery as a whole, Mr. Dixon has plausibly alleged a breakdown in the system such that his medication administration could be constitutionally deficient. *See generally Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017). Perhaps through discovery Mr. Dixon will learn that one particular person bears the necessary culpability to be considered deliberately indifferent, in which case he may seek to amend his complaint to add those allegations and that defendant. But repeated acts of negligence by different people cannot be combined to hold them all, collectively, responsible for deliberate indifference. *See Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 811 (7th Cir. 2000) ("Zentmyer does not present evidence that any individual defendant failed to administer so many doses that the defendant's actions by themselves instantiate deliberate indifference, nor does Zentmyer allege any agreement among the defendants to deprive him of medical care."); *Andreyev v. Kjorlie*, 455 F. Appx. 693, 696 (7th Cir. 2011) ("This is not a case where a single jailer denied a prisoner a toothbrush and toothpaste 15 times, in which case a reasonable trier of fact might conclude that the jailer was on notice of the prisoner's lack of toothpaste. No single defendant refused Andreyev a toothbrush more than four times, and most of the defendants turned him down no more than once or twice.") (citation omitted). But a private company providing medical care in a prison can be sued under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), so long as the "unconstitutional acts of their employees . . . were carried out pursuant to an official custom or policy." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (citations omitted). Mr. Dixon has plausibly alleged that the medication distribution and renewal system put into place by the prison's

7

medical provider, Centurion Health Services, is so obviously deficient that the company was aware that prisoners' medical care will be deficient as a result. *See Glisson*, 849 F.3d at 378-82 (discussing when *Monell* liability exists for company providing medical care in prison, even though no individual medical provider was deliberately indifferent to a serious medical need). He may proceed against Centurion Health Services, but not the individual staff members who were involved in providing his medication.

Next, Mr. Dixon complains that, in June 2025, Nurse Hamlin refused to re-order the Bengay cream his oncologist recommended to use for muscle cramps and pain. Instead, she told him to order the pain relief cream available through the commissary. Mr. Dixon told her the commissary cream—CareALL—was not strong enough, and he needed Bengay, but she refused. When he saw his oncologist again in September 2025, that doctor again recommended Bengay after his told her how he was in extreme pain throughout the day and night. When he returned to the prison, Nurse Hamlin told Mr. Dixon that, though the oncologist had ordered the Bengay cream, it was her opinion that he did not need it. He reiterated that he was in extreme pain and Bengay gives him relief, but the commissary brand does not. He notes Bengay has a stronger dosage of medicine than the commissary brand.[2]

---

[2] The active ingredients in Bengay are 4% camphor, 10% menthol, and 30% methyl salicylate. Ultra Strength BENGAY® Non-Greasy Topical Pain Relief Cream, https://www.bengay.com/products/ultra-strength-cream (last visited Jan. 7, 2026). The active ingredients in CareAll Muscle Rub are 10% menthol and 15% methyl salicylate 15%. CareALL: Muscle Rub Greaseless Pain Relieving Cream, https://careallproducts.com/products/muscle-rub/ (last visited Jan. 7, 2026).

8

It violates the Eighth Amendment to persist in an ineffective course of treatment. Mr. Dixon has plausibly alleged Nurse Hamiln's decision to keep him on CareALL cream, which Mr. Dixon asserts is ineffective, constitutes deliberate indifference. It is possible that, through discovery, Mr. Dixon will learn that she used her medical judgment to reject Bengay. But giving Mr. Dixon the inferences he is entitled to at this stage, this claim may proceed.

Next, Mr. Dixon complains that his pre-renal diet was discontinued, right at a time when his kidney damage worsened. Mr. Dixon says that on August 5, 2025, Dr. Partain informed him that she was not going to renew the pre-renal diet that his oncologist had ordered as a treatment for kidney damage. It appears she may have made this decision because he had been eating food that was not compliant with that diet. When he submitted a healthcare request form about the change in diet, he was told that he no longer meets the criteria for a medically prescribed diet. ECF 9-1 at 85. His pre-renal diet was renewed at a September 2025 oncologist visit, but Nurse Hamlin said she was not going to honor that because she did not find that Mr. Dixon qualified for the pre-renal diet. Mr. Dixon believes the damage to his kidneys has progressed from borderline kidney disease to stage 1 kidney disease. He alleges, therefore, that his oncologist upgraded the diet from a pre-renal diet to a renal diet, but the medical providers at Miami will not comply with the orders.

Here, Mr. Dixon has plausibly alleged he has a serious medical need due to kidney damage. A difference of opinion between two medical professionals about the proper course of treatment does not violate the Eighth Amendment. But giving Mr. Dixon the

9

inferences to which he is entitled, he may proceed on this claim against Nurse Hamlin and Dr. Partain. However, he may not proceed against Nurse Shalana Seifert, whom he also blames for the diet decision. Her involvement was limited to discouraging Dr. Partain from taking a blood sample to run tests to confirm whether Mr. Dixon needed the pre-renal diet. There are no allegations that Nurse Seifert had any decisionmaking authority. ECF 9-1 at 87 (stating medical director made the decision not to renew).

In addition, because Mr. Dixon alleges his problems concerning the inadequate administration of medication, his muscle pain and cramps, and the need for a medical diet to address alleged kidney damage is ongoing, he may proceed on a claim for injunctive relief to receive adequate medication administration, medical care for his muscle pain and cramps, and medical care for his kidney damage. The Warden of Miami Correctional Facility has both the authority and the responsibility to ensure that Mr. Dixon receives constitutionally adequate medical care as required by the Eighth Amendment. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Therefore, the Warden will be made a defendant and Mr. Dixon will be granted leave to proceed on an official capacity claim for permanent injunctive relief to receive adequate medical care for these issues.

Finally, Mr. Dixon alleges he has difficulty walking, and he complains that Nurse Hamlin is not providing adequate medical care for his condition. He says he often experiences blurred vision, dizziness, and pain in his body that leaves him unable to walk, and he cannot walk more than 15-20 steps without falling down. While Nurse Hamlin was on maternity leave, Dr. Partain was treating him, and she had been taking

steps to get him tested and move towards a consultation with a neurologist. Dr. Partain ordered a head CT scan to occur at the same time he was going to have an abdominal CT scan, but all those plans stopped in June 2025 when Nurse Hamlin returned. In response to a healthcare request form he submitted about the canceled testing, Dr. Partain explained to him that once she was able to review the imaging he has had and all the hospitalization documentation, she no longer thought the CT scan and neurologist referral was appropriate. ECF 9-1 at 81. Mr. Dixon complains that when he tells Nurse Hamlin about his symptoms, she does not provide him any treatment. Instead, she tells him about how her aunt and grandmother handle pain and falling down, and then she sends him on his way without further treatment. Mr. Dixon has plausibly alleged that Nurse Hamlin and Dr. Partain are providing constitutionally inadequate medical care for his walking difficulties, and he may proceed against them.

Mr. Dixon filed a motion for a preliminary injunction. ECF 12. He asks the court to order the health care providers to stop delaying his cancer follow up appointments, to follow his oncologist's orders for a renal diet, and to follow his oncologist's directions in providing his cancer medications.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

11

that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [she] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of [her] case." *Id.* at 763 (quotations omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012)

12

(citation and quotations omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Here, Mr. Dixon is proceeding on claims related to his kidneys, the treatment of his muscle pain and cramps, and the administration of his cancer medication, and he alleges these problems are ongoing. He has not stated a claim regarding his cancer follow-up appointments, so he has no chance of success on the merits regarding those appointments. The preliminary injunction motion will be limited to the provision of constitutionally adequate administration of his medication, medical care for his alleged kidney failure, and medical care for his muscle pain and cramps. In light of the deference owed to prison medical providers and the limitations on granting injunctive relief in the prison setting, the court will order the Warden to respond before taking further action on Mr. Dixon's motion for a preliminary injunction.

For these reasons, the court:

(1) DIRECTS the clerk to add as a defendant the Warden of Miami Correctional Facility in his official capacity;

(2) GRANTS Kelvin Wayne Dixon leave to proceed against Centurion Health Services in its official capacity for compensatory and punitive damages for putting into place a constitutionally deficient system for dispensing and renewing medications in violation of the Eighth Amendment;

(3) GRANTS Kelvin Wayne Dixon leave to proceed against Nurse Danielle Hamlin in her individual capacity for compensatory and punitive damages for denying him a

prescription for Bengay or other adequate treatment for his muscle pain and cramps in violation of the Eighth Amendment;

(4) GRANTS Kelvin Wayne Dixon leave to proceed against Nurse Danielle Hamlin and Dr. Kristin Partain in their individual capacities for compensatory and punitive damages for denying him a pre-renal or renal diet to address his alleged kidney damage in violation of the Eighth Amendment;

(5) GRANTS Kelvin Wayne Dixon leave to proceed against Nurse Danielle Hamlin and Dr. Kristin Partain in their individual capacities for compensatory and punitive damages for failing to take further steps to address his walking difficulties in violation of the Eighth Amendment;

(6) GRANTS Kelvin Wayne Dixon leave to proceed against the Warden of Miami Correctional Facility in his official capacity for permanent injunctive relief to receive constitutionally adequate medication administration, medical care for his muscle pain and cramps, and medical care for his kidney damage to the extent required by the Eighth Amendment;

(7) DISMISSES all other claims;

(8) DISMISSES LeeAnn Ivers, Shalana Seifert, Felisha Gray, Heather Motez, Aramark Food Services, Kim Myers, McAllister, Newby, Debbie, and Sherr;

(9) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) the Warden of Miami Correctional Facility at the Indiana

Department of Correction, with a copy of this order, the complaint (ECF 9), and the motion for a preliminary injunction (ECF 12);

(10) DIRECTS the clerk to fax or email a copy of the same documents to the Warden of Miami Correctional Facility at Miami Correctional Facility;

(11) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Nurse Danielle Hamlin, Dr. Kristin Partain, and Centurion Health Services at Centurion Health of Indiana, LLC, with a copy of this order, the complaint (ECF 9), and the motion for a preliminary injunction (ECF 12);

(12) ORDERS the Indiana Department of Correction and Centurion Health of Indiana, LLC to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information;

(13) ORDERS the Warden to file and serve a response to the plaintiff's motion for a preliminary injunction no later than **February 6, 2026**, with supporting documentation and declarations from staff as necessary, addressing the plaintiff's current medical needs and the steps being taken to address those needs, with any reply due by **February 20, 2026**; and

(14) ORDERS, under 42 U.S.C. § 1997e(g)(2), Centurion Health Services, Nurse Danielle Hamlin, Dr. Kristin Partain, and the Warden to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

15

SO ORDERED.

January 14, 2026                                         *s/ Damon R. Leichty*
                                                          Judge, United States District Court